REIMERS v. SAGINAW-BAY CITY RAILWAY CO.

STREET RAILWAYS — NEGLIGENCE — PERSONAL INJURIES — HIGH-
WAYS AND STREETS—DUTY TO USE CARE.
    Applying the rule that a motorman is not limited to avoiding
    a collision on the track when horses become frightened by
    the operation of the car, but must guard, so far as possible,
    against injury to others resulting from such frightened ani-
    mals, whether on or off the tracks, it is *held*, in a case brought
    to recover for the motorman's negligence in operating the
    car and frightening a horse by the loud ringing of the bell,
    that there was no evidence of gross or wanton negligence as
    claimed by plaintiff.[1]

Error to Saginaw; Gage, J. Submitted January 30,
1913. (Docket No. 54.) Decided March 21, 1913.

Case by Elizabeth Reimers against the Saginaw-Bay
City Railway Company for personal injuries. Judgment
for plaintiff. Defendant brings error. Reversed; new
trial refused.

*Weadock & Weadock*, for appellant.

*Gallup, Rogner & Gallup*, for appellee.

STEERE, C. J. Plaintiff recovered a verdict and judg-
ment in the circuit court of Saginaw county against the
defendant for the sum of $1,500 in an action for personal
injuries which she claimed to have received on February
17, 1911, by reason of the gross negligence of one of de-
fendant's employés.

Plaintiff was a Russian woman about 50 years of age,
who at the time of the accident complained of had resided
in the city of Saginaw for some eight or nine years. She
was a widow with four children; she and they earning a

[1] As to frightening of horse by street car, see notes in 34 L. R. A.
482; and 21 L. R. A. (N. S.) 283.

livelihood by caring for sugar beet crops in the adjacent country, taking contracts therefor by the acre before the time of planting. On the day in question she hired a fellow countryman by the name of Fahnenstiel to take her into the country with his horse and buggy for the purpose of interviewing a farmer for whom she had previously worked, and with whom she contemplated making a contract relative to his anticipated beet crop for the ensuing season. The fellow countryman called at her house in the morning with his horse and buggy, and they drove out to the farmer's place as arranged, returning some time before noon. On the way going and coming they crossed the Pere Marquette Railroad tracks, on which were numerous engines moving back and forth, ringing bells, emitting steam, etc., and also met and were overtaken and passed by several street cars and automobiles, which in no way frightened or disturbed the horse. On their return, while driving southerly into the city along North Washington avenue, on the west side of the street car track which traverses that thoroughfare, a car came up from behind and the motorman rang his gong as he approached, when the horse became frightened, started to gallop, and ran down the street in the same direction the car was going, for about 400 feet, to a point where a farmer's Concord buggy stood at a hitching post on the west side of the street. The driver did not succeed in stopping the horse, but guided him in his course successfully, until, as he claimed, in attempting to pass the Concord buggy, he turned to the west, towards the curb, and his buggy struck a hitching post, tipped over, and threw them both out. Neither then appeared to have sustained much injury. Plaintiff arose, and in a short time took the next street car downtown. Her fellow countryman went after his horse, which had broken loose from the buggy and gone on. She testifies, "When he pulled him into the side, that is, where the buggy tipped over," that she felt herself to have been hurt, and took the street car down town to see her doctor; that she suffered severe pains,

went home and was laid up for eight weeks, it developing that she was suffering from a floating kidney. She knew it was a floating kidney because she felt it, and her doctor told her so.

It is the testimony of Fahnenstiel, the owner of the horse, that it was 13 years old, of steady and reluctant habits, very tame and gentle, being "one of the gentlest horses in the county of Saginaw," not afraid of steam cars, street cars, automobiles, puffing of steam or ringing of bells; that it had never become frightened or ran away before, though he had driven it much around Saginaw "when the street cars were ringing frequently;" that it was a "fair running horse," compared with a fast runner, and on this exceptional occasion when it was running away it ran with all its might and nearly as fast as the street car, which, the testimony of others showed, was running not to exceed 8 or 10 miles an hour; that he was unable to account for its unusual fright on this occasion, except by the sudden ringing of the gong of the street car. Other witnesses, *de circumstantibus*, who were near by, ascribe this manifestation of fear and activity on the part of the horse to "a testing machine" which flitted by on the other side just at that time going 30 miles an hour, the tester being one of those recent developments of our complicated civilization appurtenant to automobile factories, who, in the work of trying out a new machine, at times suddenly and unexpectedly appears and disappears on the highways in a skeleton automobile in a cloud of dust or mud as the case may be. At the conclusion of the testimony, defendant's counsel moved the court for a directed verdict in its favor, for the reason that the testimony disclosed no actionable negligence on its part, which motion was denied.

The negligence charged against defendant in plaintiff's declaration is that it failed to employ careful, competent, experienced, and prudent servants, drove its car at an unreasonable and improper speed of 20 miles an hour, failed to keep its car under proper control so as to stop

within a reasonable distance; that it wilfully sounded its gong on its car in such a wanton and improper manner that it would and did frighten the horse hitched to the vehicle in which plaintiff was riding—

"And did, through a wanton, negligent, and wilful disregard of the apparent danger to the said plaintiff, continue to drive its said car along and upon the said highway and especially along and upon its said west tracks on said North Washington street, at a high rate of speed, after it became and was apparent to the said servants, agents, and employés of the said defendant that the said horse hitched to the said vehicle in which the plaintiff was riding, as aforesaid, had become and was greatly frightened and unmanageable, and after its servants, agents and employés saw or should have seen that by reason of the blocking and obstructing of said street by the other vehicle, as aforesaid, that unless it did so stop its said cars it would result in injury to the plaintiff so riding behind the said animal hitched to said vehicle, as aforesaid, and wantonly, negligently, and wilfully drove its said car so close to the rear of said vehicle in which the said plaintiff was riding, as aforesaid, that the defendant forced the said horse and vehicle in which the plaintiff was riding into a pocket."

The trial court submitted the case to the jury on the last proposition only, saying:

"Gentlemen of the jury, the only question, then, that I submit to you in this case with regard to the negligence of the defendant in this case is as to whether this motorman, after he discovered or should have discovered, by the exercise of reasonable care and caution, that this horse was beyond control, failed to take such precautions as a prudent man would have done under the circumstances to prevent this accident. That is as to whether he used such care and caution as was his duty to use to stop his car, if he saw it was necessary to do so, in order to prevent an accident occurring."

This issue was raised by the allegations in the fourth count of plaintiff's declaration, added by amendment, charging gross negligence in operating the car. In behalf of defendant, it is contended that, under the undis-

puted evidence, considered in its most favorable aspect for plaintiff, the capsizing of the buggy in which she was riding must either be attributed to the mismanagement and negligence of her driver, which, as between her and defendant, must be imputed to her, or, in the nature of things, it is to be regarded as an unavoidable accident, based on the great truth, promulgated centuries before street cars and automobiles came to bless, or vex, mankind, that "an horse is a vain thing for safety," even though he may be "one of the gentlest horses in Saginaw county," and the modern doctrine of discovered negligence, last clear chance, or gross negligence, has no application. This calls for a consideration of the disputed and undisputed testimony claimed to have a bearing on that proposition.

It appears, undisputed, that, on the occasion in question, plaintiff was riding with her driver, south along the west side of North Washington avenue, in the city of Saginaw, behind an old, well-broken and gentle horse, accustomed to, and never before known to be afraid of, automobiles and street cars, or their noises. They were in a single, top buggy, with the top up, "inclosed as much as a top buggy can be," with the side and back curtains on, it being a cold day, the rear curtain having a glass in it about two by four or five inches in size, and the front open, giving a clear view forward, to and past the horse. That portion of Washington avenue is 100 feet wide, 43 feet of which are paved, a double line of defendant's street car tracks running along the center; beyond the curb, on each side, the balance of the street is devoted first, to 18 or 19 feet of lawn or grass plat, beyond which is about 6 feet of sidewalk and then about 3 feet of lawn to the lot line. The distance from the outer side of the west rail of the west car track to the west curb is about 14.9 feet. As they were driving along this space about 9 feet from the track, a street car going in the same direction on the west track came up behind them and when near, but before reaching them, the motorman sounded a warning with his

gong in the usual manner. It is testified by witnesses, and not disputed except by the statement of others that they did not see it, that at the same time the skeleton, or chassis, of an automobile, covered with mud, passed rapidly by on the opposite side of the car from where plaintiff was riding, going in the opposite direction. The horse suddenly became frightened, jumped to the right, or west, and started ahead along the street on a gallop, going straight away practically on its former course, well outside of the track and near the west curb. The street was clear in front, with the exception of a single rig, consisting of a horse and Concord buggy, standing by the west curb about 400 feet away, the horse headed south and hitched to a post at the curb, the right wheel of the buggy within a foot or 18 inches of the curb. This vehicle was about 5 feet 4½ inches wide at the hubs. When the running horse approached the rig standing hitched by the curb, the driver guided him to the right, onto the curb, intending, as he states, to pass by the standing rig on the grass plat to the west, fearing, if he tried to pass on the left, to the east, he would be caught by the car which was following. As he pulled the horse to the west, over the curb, the buggy collided with a hitching post, north of that at which the rig by the curb stood, and capsized. The occupants went over with the buggy, freed themselves from the top, and got up. Plaintiff testified that where she fell " was clear, just only the grass there." The car which had followed behind stopped nearly opposite where the accident occurred. The cars used by defendant overhung the rails on which they ran one foot 8½ inches on each side. The extent to which plaintiff was injured was a matter of serious dispute, but, in any aspect of the case, would not be a question for the court, nor for review here.

In support of the charge of gross negligence, counsel for plaintiff urge there was abundance of evidence for the jury to find:

(1) That the horse took fright from 400 to 500 feet north from the point of injury.

(2) That the motorman, when 30 feet in the rear, saw the horse when it first took fright, and saw it running all of the time.

(3) That the motorman saw and knew the blocked condition of the street from the time the horse first began to run.

(4) That the motorman gained 10 feet on this light driving horse, running at frightened speed and stopped his car alongside of the Bender rig hitched to the post.

(5) That the motorman, in view of these facts and his admitted knowledge of them, wantonly and recklessly pursued this frightened horse for upwards of 400 feet, even gaining 10 feet on the rig in that distance and forced the plaintiff to choose between the two perils, as explained heretofore, with a wanton and reckless disregard of the plaintiff and her rights.

The claim that plaintiff's driver was forced to choose between two perils is mathematically presented from the testimony as follows:

" The space open for plaintiff's driver to pass through with his frightened, runaway horse was 6 feet $2\frac{2}{3}$ inches. His buggy was 5 feet $4\frac{1}{2}$ inches wide. Therefore the clearance of his buggy was only $9\frac{9}{10}$ inches, or substantially 5 inches on each side."

This is necessarily on the assumption that the car would have been directly opposite the Concord buggy standing by the curb at the exact time plaintiff's driver attempted to pass it. He testified there might have been room even to drive past to the west of the rail "if a man would drive slow, but not in an accident like that." As his horse went down the street, it was necessary to swerve but little out of his course to pass, and, if in doing so he went upon the track at all, he needed to be there but an instant. We think the testimony of Fahnenstiel and plaintiff herself, not only fails to show that the car was there to form a "pocket," but, on the contrary, that it was entirely back of them. That the car was closely following them, and fear of it caused the driver to endeavor to go round

to the right, over the curb along the lawn, past the post he struck and trees he says were there, instead of swinging to the left on the clear, paved street, may be conceded. The vital question is whether appellant is legally responsible for the consequences of his doing so. This is not a case of a collision on the track resulting from the car not being under control. On the danger of a collision and the necessity of leaving the paved street, the strongest statements of plaintiff are as follows: That "there was nothing in the street but a buggy;" that her—

"Horse was right up to the other buggy, could not get out of the way on account of the street car. * * * He had to turn the horse in order to get away from the street car. The street car was right up with us all the way down and it was right there when it tipped over. * * * He couldn't hold it. The car was too close and the horse got frightened all the time."

But on further examination she also testifies that she did not see the car at all until after the accident, as follows:

"*Q.* You didn't see the street car that the bell rang on at all, did you, that morning, that was back of you?

"*A.* I couldn't see it. They struck the bell and the horse got unmanageable. * * *

"*Q.* Can you tell us anything at all about how far back of you the car was when they rang the bell or whether it was near to you?

"*A.* I didn't look around, I don't know how far.

"*Q.* Well, it sounded near, didn't it?

"*A.* Yes.

"*Q.* You knew that it was a warning to you to keep off the track?

"*A.* Yes.

"*Q.* Just like they always do?

"*A.* Yes.

"*Q.* And that was all there was to it?

"*A.* Yes; he tapped the bell three or four times, four or five times."

And along the same lines Fahnenstiel, the driver, testifies:

"The car followed me. I tried my best to hold the

horse.   I seen the wagon ahead of me.   When I came
close to the wagon, I looked around.   The car was right
next to me pretty close.   I couldn't have any chance to
get through.   It was danger for the life; so I drive the
horse to go out on the other side.   I pull on the other line
when the horse got near the wagon.   The wheel struck
the hitching post.   The buggy tipped over, and we both
got out.   The horse broke the crossbar and the thill, and
broke the two lines,   *   *   *   and then the car kept go-
ing, gained on me.   There is a glass in the hind end of
my buggy.   *   *   *

"*Q.* How far was the street car from you when the
gong rang?

"*A.* The first time I couldn't tell you, I wasn't close
enough.

"*Q.* You couldn't see it at all?

"*A.* No, sir.   *   *   *

"*Q.* You didn't see it at any time from that time until
you turned off, did you?

"*A.* I didn't see the car before I turned.   *   *   *   I
said there was a little window in the back of the buggy.
*   *   *

"*Q.* How long did you spend looking out through that
little opening in the back?

"*A.* Not very long.

"*Q.* When you did look back, how far behind you was
the car?

"*A.* From two to three rods.   *   *   *

"*Q.* When you came up nearer the other wagon you
turned on the grass plat?

"*A.* Yes.

"*Q.* You didn't attempt to drive to the left at all and
cross?

"*A.* I didn't.   *   *   *

"*Q.* The car was still back of you 50 feet all the way?

"*A.* No, sir; the car gained on me.   I looked back
afterwards to find out, when I got near the other buggy.
*   *   *

"*Q.* You knew from seeing there that there was 14 or
15 feet between the curb and the west rail?

"*A.* Just about that I think."

That the horse was running away is in a sense true, but
this expression is relative.   He had been frightened and

174 Mich.—80.

started running, and at the time of the accident the driver had not recovered control of his speed, but was guiding his course along the street, and, according to his own testimony, was also able to turn around and look through the little window in the rear curtain, and observe the proximity of the car before deciding to turn to the right off from the pavement.

Aside from the testimony of plaintiff and her driver that their horse was running very fast and the car kept up with them, the testimony of other witnesses as to the speed of the car was that it was not running fast. The estimate of rate by various witnesses, some of whom were apparently disinterested passengers, was from six to ten miles an hour, the highest estimate given being that of the motorman, who says:

"At the time I first tapped the bell, I believe I was going between eight and ten."

He testified: That later he was going slower, had shut off the current, and was "floating"; that all the way along he was about 20 feet behind the rig and between 20 and 30 feet distant, when it turned to the right; that he had taken up the slack in his brake and had the car all the time under full control, going then between 6 and 8 miles an hour. All he noticed was that the horse was galloping, but it was ahead of him, going straight, clear of the track, between it and the curb. He could not see the driver, and did not know the horse was not under control. That he watched, keeping his eye on it all the time. That, when the horse was turned to the right against the post, he stopped his car with the front end opposite the rig hitched to the post, which, according to other evidence, was $15\frac{8}{10}$ feet south of the post plaintiff's rig collided with. She testifies:

"When I stood up, the car was right opposite where our buggy was."

Several other witnesses also testified that the car stopped opposite the place of the accident. This shows conclu-

sively that the car was far enough back to permit plaintiff's rig to pass the Concord buggy, on the track if necessary, without interference, and the testimony of the motorman that he had his car under control and was watching is not disputed.   He brought his car to a stop at that point, and did so, as is testified to by the conductor, after the accident at the post, for the purpose of going over to see if they could give any assistance, and not in an emergency to avoid an impending accident on the track.

While there is some conflict of testimony as to the speed at which the horse was running, whether or not he was running as fast as he could, whether he appeared to be running away, and other matters of like nature, the controlling and essential facts are substantially established without serious issue.   The accident did not occur at a crossing or on the track.   It occurred in the middle of a block, and was caused by the driver of the horse guiding him from a direct course down the street to one side, where a hitching post, against which he ran, stood inside the curb.   The car complained of was running on its regular route, at its regular speed, and, when the horse by the side of the track started up and began to gallop, the car continued on its course, following behind.   There was nothing to indicate to the motorman that the driver could not guide the horse.   He testified that, though he saw it galloping, he did not know it was running away or was beyond control.   He was far enough in the rear for the rig to safely pass the standing buggy.   The top of the buggy was between him and the horse.   It was going straight along the street, clear of the track, and 20 or 30 feet ahead.   It is his undisputed testimony that he slackened speed, cut off the current, took up the slack of his brake, was watching the horse, and had his car under control.   He had a right to continue on his course, in the usual manner until it was apparent to him the plaintiff was in danger.   If he had his car under control, and was sufficiently back to leave the width of the street for the rig to pass the conveyance by

the curb, he did not drive it into a pocket, or jeopardize its safety in that particular. That he was sufficiently far back is clear, and his testimony that he had his car under control is confirmed by the stop he made when the driver turned and ran against the post. He could not anticipate the driver would turn in the direction he did. The indications were that he could, and the facts were that he did, guide the horse; and the natural expectation would be that he would continue down the paved street, passing to the left of the standing rig by the curb. While the motorman was not allowed to give his views as to the room and the opportunity for the rig to pass on that side, it does appear that he was watching the horse, had cut off the current, slackened speed, and had control of his car as they approached that point. Apparently it was the fear of the driver of the rig that the motorman had not done so which caused him to turn towards the side where he could not have as wide and unobstructed a course to pass by the buggy at the curb, and for this misapprehension only it would scarcely be contended that defendant is legally responsible.

Plaintiff's counsel say that the rule in this State which governs the case before us is found in *Chauvin* v. *Railway*, 135 Mich. 85 (97 N. W. 160); *McClellan* v. *Railway Co.*, 105 Mich. 101 (62 N. W. 1025); *Montgomery* v. *Railway Co.*, 103 Mich. 46 (61 N. W. 543, 29 L. R. A. 287); *McVean* v. *Railway*, 138 Mich. 263 (101 N. W. 527). In each of those cases the injury resulted from a collision with a car on the track, and the duty of the motorman to control and stop his car before it struck plaintiff was held to be an issue for the jury. In *Montgomery* v. *Railway Co.*, *supra*, the motorman did not have his car under proper control, and ran down a member of a band in a street parade. The band drowned the noise of the car and the warning given by its bell. The court there said:

"The motorman knew that the band was ahead of the car. He recognized the danger of those on the west side

being blown upon the track.   He saw Grinnell, and knew he was in close proximity to the track, heard the band playing, and knew that the noise of the approaching car would be liable to be drowned by the noise of the band; yet, if the testimony of the plaintiff's witnesses be true, he did not slacken his speed.   He kept the lever in next to the fastest notch, at least until within a few feet of these parties; and the testimony shows the car must have been under considerable speed, as it ran over 30 feet after caus- ing the injury, though the motorman claims to have stopped it as soon as he could after it struck.   *   *   * In the present case the testimony shows that the motor- man saw the danger Grinnell was in.   It is common knowledge, and not disputed on this record, that, when the electric car and its appliances are in proper condition, the motorman has perfect control over it.   He may run it at so slow a rate of speed that it can be stopped at once— almost in an instant.   Here the motorman saw the dan- ger.   He should have slowed down, and, if necessary to avoid danger, stopped his car."

In *McClellan* v. *Railway Co., supra,* decedent was run into and killed while on defendant's track endeavor- ing to get a colt off the track, out of the way of an ap- proaching car, the noise and sounding gong of which had frightened the colt.   There was testimony tending to show that the situation was apparent to the motorman, and that he had ample opportunity to bring his car under control and avoid the accident, but neglected to do so.   It was held that the question of his negligence and the decedent's contributory negligence were for the jury.

*Chauvin* v. *Railway, supra,* was a crossing case, where, in attempting to cross defendant's double tracks, one of plaintiff's horses was killed and another injured by a car, he being confused by two cars in sight going in different directions.   While he was observing and avoid- ing one his team was run into by the other.   It was held, under the circumstances shown, that plaintiff was not necessarily, as a matter of law, guilty of contributory negli- gence, and, there being testimony that the car which did the injury was running at an excessive rate of speed and

no effort was made to stop it, the motorman's negligence was held to be a question of fact.

In *McVean* v. *Railway, supra*, which is urged as directly in point and controlling here, a young girl 15 years of age, riding with her sister in a buggy drawn by one horse, was struck and injured by a car coming from behind as she jumped from the buggy with the intention of holding the horse, which was frightened, by the head, while the car passed.  The negligence charged was—

"That the defendant ran the car at an excessive and unlawful rate of speed, thereby causing the dust and leaves to fly in the air, which frightened the horse, and that the motorman did not keep his car under sufficient control."

There was evidence that the car ran at a speed as high as 20 miles an hour, causing a commotion of leaves and dust which frightened the horse, and that the motorman did not have his car under check.  The court there said:

"The motorman admitted that, when he saw the horse appeared to be frightened, he did not at once bring his car under control, but gradually reduced its speed.  There were other vehicles in this narrow space, and we think it was the duty of the motorman, on seeing that any horse in such a place was frightened, to immediately bring his car under control, so far as it was possible for him to do so."

In the case at bar it is not shown that the car was run at an excessive rate of speed, or that the motorman did not have it under control.  He testifies, and it is undisputed, that he had control and was watching the horse. There is no testimony to show that he could not and would not have stopped his car in time to avoid a collision had the horse been driven on the track and the necessity arisen. In this case plaintiff's conveyance was never on defendant's track, and the facts in the cases cited are far from analogous.

It is also to be recognized that the duty of the motorman is not limited to avoiding a collision on the track when horses driven along the highway become frightened

at the operation of his car.   That duty extends to guarding, so far as possible, against any injury to others which might result from such fright, whether on or off the track. To that end he should check or stop his car with reasonable diligence upon discovering any perilous situation. But in this case it is not shown that he knew there was a perilous situation, except as it was created by plaintiff's driver suddenly pulling his horse away from the car tracks, to the right, where it ran against the hitching post. Previous to this the motorman had taken precautions preparatory to stopping quickly, and, on observing the sudden change in the direction the horse was going, he at once made a good stop.   Before that, when the horse and buggy were going down the street in a straight course away from him, the inclosed top buggy prevented him from seeing what the driver was doing.   He could not tell, and did not know, whether the horse was being held back or urged forward.   He testified he did not know it was unmanageable or running away.   As it appeared to him, though it was galloping, it was being safely guided along the paved highway, pursuing a straight course. There was plenty of room in the clear street ahead to safely pass by the buggy at the curb, and his car was back of the place of passage, under check and full control. Against his undisputed testimony as to what he saw and what he did, we cannot assume that he would have run his car into plaintiff's buggy had it crossed over the car tracks ahead of him or proceeded along them.   The evidence fails to disclose any wanton misconduct or gross negligence on his part for which defendant must respond.

The judgment is reversed, and no new trial granted.

MOORE, McALVAY, BROOKE, KUHN, STONE, and BIRD, JJ., concurred.   OSTRANDER, J., did not sit.